(Supreme Court, Appellate Division, Third Department. May 2, 1906.)

1. CARRIERS—CARRIAGE OF PASSENGERS—INJURY TO PERSON AT STATION.

At a railroad station, where there were four tracks, the one nearest the station and the one furthest from it were used for switching purposes. After the departure of a passenger train at its regular time on one of the main tracks, and at a time when no train was due to leave for an hour, decedent entered the station for the purpose of taking the train that had gone. Without making any inquiries he passed through the station to the tracks. The nearest track was occupied by a train of box cars, in which there was an opening, and over tne tops of such cars a string of passenger coaches was visible. Decedent undertook to pass through the opening and was killed by the parts of the train coming together. *Held*, that the railroad was not guilty of negligence.

2. SAME—CONTRIBUTORY NEGLIGENCE.

Decedent was guilty of contributory negligence.

Appeal from Trial Term, Rensselaer County.

Action by George B. Van Ostrand, as administrator of the estate of Roscoe C. Van Ostrand, deceased, against the Delaware & Hudson Company. From a judgment in favor of plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before PARKER, P. J., and SMITH, CHESTER, KELLOGG, and COCHRANE, JJ.

Lewis E. Carr, for appellant.

Harry S. Sleicher (John B. Holmes, of counsel), for respondent.

PARKER, P. J. The defendant operates a railroad running from Binghamton to Albany through the village of Oneonta, in this state. The depot and platform at Oneonta is practically on a level with the tracks, and opposite such depot are four tracks. The one next to the depot platform, numbered one, is used as a switch track and is about 30 feet distant therefrom. The next two tracks, numbered two and three, are the main line tracks, and the next track, numbered four, is used for another switch. In taking any train at this station, passengers must step from the platform of the depot onto the ground—but a slight step down—then on the ground for about 30 feet to track No. 1, and then across it to No. 2 or 3, on which the passenger train stands. On the 22d day of September, 1900, the plaintiff's intestate came to the depot at Oneonta, entered it on the side farthest from the tracks, passed directly through, and went out upon the platform. He there found freight cars occupying track No. 1 and extending thereon the whole length of the depot, and which would effectually block the way from the platform to the main line tracks, but that a space about five feet in width existed between two of such freight cars. Through this space of five feet, which was somewhat east of the easterly door of the depot, the deceased attempted to pass over track No. 1. Just as he reached the middle of that track the engine that was attached to the westerly end of such freight cars backed up, the opening was thereby closed, and the deceased was caught between the cars and killed. On track No. 4 a number of passenger cars and a baggage car were standing; the baggage car being at the westerly or Binghamton end

of such train.   No engine was attached thereto, and such cars were not made up into a train and ready to start, but were stored there as upon a switch.   Such cars were intended to be taken out as an accommodation train west to Binghamton at 11 o'clock in the forenoon.   A train, No. 2, from Binghamton to Albany was, by its regular and advertised time, due to arrive at Oneonta every day at 10:05 and leave at 10:10 in the forenoon, and the plaintiff claims that the deceased, whose home was in Troy, N. Y., went to that depot intending to take such 10:10 train on his way home.   The cars which stood on track 4 arrived from Albany that morning at 10:05 on track No. 2, discharged its passengers, and then backed over onto No. 4, and were there waiting until 11 a. m. to further proceed as the accommodation to Binghamton above referred to.

It is a contested question between the parties whether the train No. 2 due from Binghamton at 10:05 had arrived before the deceased was injured.   The plaintiff claims that it did not arrive until just after he was killed and had been carried into the freight room of the depot. The defendant claims that it had come and gone before the deceased arrived at the depot.   A careful study of the evidence in this case convinces me that upon this question the defendant is correct, and that such train for Albany had left the station before the deceased arrived there, and before the freight cars, which he found obstructing the track No. 1 when he attempted to cross it, had been placed there.   So far as the verdict of the jury must be deemed to be a finding against the defendant upon this claim, it is so clearly against the great weight of evidence on that question that it should be reversed, and in the examination of this case we must consider it as if train No. 2 had already departed.

Concede then, that the deceased went to this station with the intent to take this train No. 2 for Albany, and we have substantially the following facts before us, viz.:   The train from Albany had arrived at 10:05, had discharged its passengers, and been switched out of the way onto switch No. 4.   The train to Albany, arriving at the same time, had gone.   No other passenger train was due to come or go until 11 o'clock.   As soon as the aforesaid trains were out of the way, the freight cars, composing a train of some 15 or 20 cars, to which the switch engine was attached, were pushed back from the west, easterly upon track No. 1 in order to take from the west end thereof and about seven cars from the engine, three coal cars to place on Pruyn's switch, which is a short distance from the west end of the depot.   That pushed the rear end of that train up so that it stood on track No. 1 opposite the whole length of the depot, and it stood there while the engine was putting the three cars taken therefrom into said switch, and the opening of about five feet between cars, in which deceased was caught, seems to have occurred by reason of never having coupled together when the cars were made into a train.   It is not clear just how that opening occurred, but it is clear that the engineer and conductor of the switch engine did not know of its existence.   And I judge from the evidence that such cars had not been uncoupled and the opening made there and purposely left by an employé of the com-

pany, nor does there appear to have been any purpose for which such
an opening would have been left. No passenger train being expected
by the defendant to come or go until 11 o'clock a. m., there was no
necessity for any one to pass from the depot over track 1 until long
after the three coal cars could be taken out and the rest of that train
entirely removed.

The deceased arrived at the depot too late for his train. He had
never been at this station before, yet he passes directly through the
waiting room out onto the platform without making any inquiries what-
ever as to where his train was, or as to how or where he could find
it, although the ticket office was before him and open. When he
reached the platform he found no passenger train there, but the freight
train blocked his view, except that it was possible to see over the tops
of such cars the passenger cars that stood on track 4, above alluded
to. Whether he did see them or not does not appear. But, without
making any inquiries at all, either at the office which was close at
his hand, or of any one about there, he at once goes diagonally to
the eastward from the door through which he had come, across the
30 feet of space between the platform and the freight cars, to the five
foot opening, and proceeds to pass through it. Just then the freight
engine, having got the three coal cars placed on Pruyn's switch and
back onto track No. 1 and coupled on to its train, again starts to
push it eastward past the depot and to some other place. Of course,
the opening is at once violently closed, and the deceased is killed.

Under such circumstances, was the jury justified in holding the de-
fendant guilty of any negligence as against the deceased? In my
opinion, it was not. Although there with the intent to take a train,
it cannot be said that he had a license, even, to wander out on to the
defendant's yard and to dodge between its cars at such times and
places as he might desire. As a matter of fact, there was no train
to arrive or depart from that yard in the next 30 minutes, and
the defendant was not, in reason, required to apprehend that any in-
tended passenger would be out in such yard attempting to cross any
of its tracks, and thus be liable to be injured by any switching that
it might find necessary, or convenient even, upon any track in such
yard. No passenger was licensed to be out in such yard searching
for the train he desired to take, and very clearly this was not a case
where the deceased was required to cross any tracks to take his train,
for there was no train then in such yard made up and ready for him,
or any one else, to take. Very clearly the defendant had no knowl-
edge that the deceased was anywhere in such yard, or about to cross
its tracks, or that any notice of the movement of its switch engine
was necessary to be given. It cannot be said that it owed him any
such notice, and therefore it was guilty of no negligence in not giving
it. The plaintiff's claim that the deceased was invited by the defend-
ant to attempt to pass through such opening, because the opening
was there and a string of passenger cars stood on No. 4 switch, which
could be seen over the top of the freight cars, is in my judgment en-
tirely unwarranted. It appears from the evidence that, as a fact, the
defendant did not create that opening for its passengers to pass

through, and that the passenger cars on track No. 4, which perhaps the deceased did mistake for a train he could take, had no engine attached, and that very slight attention would indicate to any one that it was not one ready to be taken.   The claim that there were passengers sitting therein is clearly not sustained by the evidence.

Clearly the situation, as it presented itself to the defendant, was not one that required it to anticipate such a misapprehension on the part of the deceased and to give notice of the movements of its switch engine.   But, beyond all this, it was the negligent conduct of the deceased himself that caused such missapprehension, if he had any, and that caused his death.   He entered into that depot and out upon that yard in utter ignorance of that locality and of the arrangements of its tracks, yet he made not the slightest effort to ascertain regarding them. Had he inquired of the man in charge of the ticket office, who was there to give such information, he would have ascertained that it was utterly unnecessary for him to pass through such opening, or to make any attempt to get across the yard and board the cars that he may have seen on switch No. 4.   The whole situation, as above detailed, would have been given him, and he would have waited in safety and taken in safety the next train that departed for Albany.   In my opinion, it is not requiring too much of any one intending to take a train to inquire at the office when and where he can find it, and if he, instead of doing that, passes out into the yard, over the tracks and between the cars in order to find out for himself, he does so at his own risk.   Under such circumstances, the company owes him no duty other than to do him no willful or intentional injury.   The trial court substantially charged the jury that the first part of such proposition was correct, viz., that he did so at his own risk, and that for his death, thus occasioned, the plaintiff could not recover.   There does not seem to be any substantial difference as to the deceased's conduct being such as above stated, and therefore it would seem that under the charge the verdict of the jury could not be sustained.

For these reasons, this judgment and order must be reversed on the law and the facts, and a new trial granted.   All concur.